CURTIS BLOOME, Plaintiff-Appellee, v. WISEMAN, SHAIKEWITZ, McGIVERN, WAHL, FLAVIN AND HESI, P.C., *et al.*, Defendants-Appellants.

Fifth District No. 5—92—0768

Opinion filed May 1, 1996.—Rehearing denied May 29, 1996.

470

472

McLAUGHLIN, J., concurring in part and dissenting in part.
KUEHN, J., specially concurring.

John L. McMullin, A.J. Bronsky, and T. Michael Ward, all of Brown & James, P.C., of St. Louis, Missouri, for appellants.

Morris B. Chapman and Melissa A. Chapman, both of Morris B. Chapman & Associates, Ltd., of Granite City, for appellee.

JUSTICE SCHWARTZ delivered the opinion of the court:

Plaintiff, Curtis Bloome, filed a legal malpractice complaint against Wiseman, Shaikewitz, McGivern, Wahl, Flavin & Hesi, P.C., and Richard Shaikewitz, Gerald McGivern, David Wahl, Robert Flavin, and David Hesi. At the close of evidence, the trial court directed verdicts in favor of defendants Robert Flavin and David Hesi. Plaintiff then voluntarily dismissed his claim against defendant Gerald McGivern. The case was submitted to the jury. The jury returned a verdict against the remaining defendants and assessed damages in the amount of $3,238,800. Defendants filed post-trial motions seeking to reduce the amount of the verdict. Ultimately, judgment was entered in the amount of $2,610,085. Defendants filed motions for new trial or for judgment notwithstanding the verdict. On October 23, 1992, these motions were denied. Defendants appeal.

Plaintiff's legal malpractice claim was based upon an underlying medical malpractice case. Plaintiff underwent open heart surgery in April 1988. He was intubated for much of this hospitalization and subsequently developed subglottic stenosis. After discharge, he began

to wheeze. He treated with a Springfield, Illinois, otolaryngologist, Dr. Finch, on May 23, 1988. Dr. Finch hospitalized plaintiff and performed a tracheostomy on May 26, 1988. Following discharge, plaintiff remained intubated due to his windpipe collapse. Between May and December 1988, Dr. Finch performed five surgical procedures related to the tracheostomy. Plaintiff continued to experience breathing problems and required emergency room treatment on more than one occasion. During this time, plaintiff experienced vocal difficulties. In January 1989, Dr. Finch referred plaintiff to Dr. Konrad. After further diagnostic studies, additional surgery was recommended. As neither Dr. Finch nor Dr. Konrad was experienced with the recommended surgical procedure, plaintiff was referred to Dr. Dedo of San Francisco, California. Between February 1989 and March 1990, Dr. Dedo performed five surgical procedures. Plaintiff's voice did not improve.

Before plaintiff retained defendants as counsel, he consulted with other local attorneys regarding the possibility of filing a medical malpractice complaint.

Plaintiff met defendant Gerald McGivern at the San Francisco airport. On February 1, 1990, plaintiff met with defendant Richard Shaikewitz and executed a contingent fee contract. Because the first of the medical procedures occurred in February 1988, defendant Shaikewitz believed that he could only protect plaintiff's claims by immediately filing suit. Defendants arranged for Peter Tuteur, M.D., to examine plaintiff on April 3, 1990. Plaintiff met with defendants again on April 16, 1990, and signed a second contract. On April 17, 1990, defendant David Wahl prepared and filed a complaint naming several physicians as defendants in Sangamon County circuit court. Defendant Wahl also filed an affidavit requesting additional time in which to file a physician's certificate of merit.

In early May 1990, Dr. Tuteur sent his report to defendants. In Dr. Tuteur's opinion, no physician associated with plaintiff's care and treatment deviated from the requisite standard of care. On May 10, 1990, defendant Wahl explained Dr. Tuteur's report to plaintiff and advised that defendants would take no further action on his case unless plaintiff located a new physician to support his claims. On May 12, 1990, defendant Wahl wrote plaintiff advising him that he was free to retain new counsel. Defendant Wahl and plaintiff discussed a voluntary dismissal, but plaintiff decided not to dismiss his suit because the law was uncertain regarding voluntary dismissal of a malpractice case unsupported by a physician's certificate.

On July 19, 1990, defendant Wahl wrote plaintiff advising that he filed a motion to withdraw and that the motion was set for hear-

ing on August 9, 1990. On August 8, 1990, some of the doctors filed motions to dismiss plaintiff's complaint because of the physician's certificate deficiency. Defendants filed no responsive pleading because they were of the opinion that the lawsuit was not meritorious. Whether or not defendants attempted to contact plaintiff before the hearing is in dispute. At the hearing, defendant Wahl and/or the plaintiff objected to the motions to dismiss, asked for a continuance so that plaintiff could obtain new counsel or a new expert, and asked the trial court to allow plaintiff to voluntarily dismiss his case. The trial court dismissed plaintiff's complaint with prejudice, stating that the court could dismiss plaintiff's complaint without a motion because plaintiff filed no physician's certificate. On October 16, 1990, the remaining defendant was dismissed from the suit. Plaintiff was unrepresented at that hearing.

The following is a list of the alleged contractual breaches committed by defendants, upon which the jury was instructed:

(a) Over plaintiff's protestations defendants permitted his medical malpractice action to be dismissed with prejudice;

(b) Defendants withdrew when it was known that a motion to dismiss was pending and would result in preemptory dismissal of the action;

(c) Defendants failed to fully explain the status of the case to plaintiff, particularly regarding its imminent dismissal;

(d) Defendants failed to seek a voluntary dismissal of said claim so that it could have been refiled in one year;

(e) Defendants failed to seek a continuance or order which would have permitted plaintiff to obtain new counsel to prevent the dismissal of his claim with prejudice; and

(f) Defendants failed to object to the untimely filing of the motion to dismiss by the medical malpractice defendants.

Defendants appeal. Only portions of this decision are to be published.

Defendants contend that the trial court erred in disallowing certain testimony related to the legal malpractice claim. The trial court sustained objections to the testimony of defendants' legal malpractice expert, attorney Thomas Keefe, regarding post-dismissal relief available to plaintiff, the reasonableness of defendants' conduct, and letters to plaintiff from other attorneys upon which attorney Keefe partially based his opinions.

During plaintiff's case, plaintiff's legal malpractice expert, attorney Gary Peel, testified that defendant Wahl's conduct at the August 9, 1990, hearing provided no basis for a meritorious appeal of the order of dismissal, in part because the hearing was not on the record. The record reflects that immediately before attorney Thomas

Keefe testified, plaintiff struck the paragraph of his complaint which involved the failure of defendants to advise the plaintiff of the importance of a motion to voluntarily dismiss his case. Defendants sought to examine their expert, Keefe, regarding whether the dismissal could have been successfully appealed or set aside within 30 days or longer after August 9, 1990, and regarding the reasonableness of defendants' conduct. The trial court sustained plaintiff's objections to this line of questioning.

■ Based upon the scope of the legal malpractice claimed, we do not find that the trial court erred in refusing Keefe's testimony on these issues. Plaintiff was not claiming that defendants committed malpractice in failing to appeal the August 9, 1990, order or have it set aside. Furthermore, plaintiff does not claim that defendants committed malpractice by not advising him how to take action to protect his claim following August 9, 1990. Before defendants' expert testified, plaintiff dismissed the only portion of his complaint that remotely bore upon these issues. The record reveals that the jury was properly informed of the appropriate standard of care owed a client in this factual situation, through the cross-examination of plaintiff's expert and in the examination of defendants' legal malpractice experts. The record further reflects that the jury was advised that whether an appeal would have been successful or not was not an issue in the case.

A legal malpractice plaintiff does not have the burden to prove the exhaustion of all avenues of appeal on the underlying claim in order to state a legal malpractice claim. See *Zupan v. Berman*, 142 Ill. App. 3d 396, 398, 491 N.E.2d 1349, 1351 (1986); *Belden v. Emmerman*, 203 Ill. App. 3d 265, 270, 560 N.E.2d 1180, 1183 (1990), *appeal denied*, 136 Ill. 2d 541, 567 N.E.2d 328 (1991) (declining to hold that a legal malpractice plaintiff's cause of action could not accrue until all avenues of appeal had been exhausted). Therefore, testimony regarding whether and how an appeal could have been successfully taken is irrelevant to the claims presented by plaintiff in this case.

If there was any error in disallowing Keefe's testimony in response to Peel's testimony, such error was harmless, not rising to a level of prejudice mandating reversal or remand for a new trial.

■ With respect to the letters upon which attorney Keefe partially based his opinions, defendants claim that the trial court's ruling was contrary to established Illinois law. The trial court stated that the letters were inadmissible as double hearsay. An expert's opinion may be based upon:

> "(1) the scientific, technical, or other specialized knowledge that makes the witness an expert, *** including facts, data, or opinions

contained in a learned treatise recognized as reliable authority, [citations], (2) firsthand observation of facts or data perceived by him before trial, [citation], (3) facts, data, or opinions introduced in evidence at trial, and (4) facts, data, or opinions not admitted into evidence when such facts, data, or opinions are types reasonably relied upon by experts in the field in forming opinions or inferences upon the subject." M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 703.1, at 573-74 (6th ed. 1994).

■ Letters written to plaintiff by other attorneys clearly do not fall into category one, two, or three. In *Wilson v. Clark*, 84 Ill. 2d 186, 417 N.E.2d 1322 (1981), our supreme court specifically adopted Federal Rules of Evidence 703 and 705, allowing experts to give opinion testimony based upon information which has not been admitted into evidence, as long as the facts relied upon are sufficiently reliable. *Wilson*, 84 Ill. 2d at 193-96, 417 N.E.2d at 1326-27. In determining whether the underlying data is sufficiently reliable, the trial court may consider whether the underlying facts forming the basis of the expert's opinion are of the type reasonably relied upon by experts in the particular field. *City of Chicago v. Anthony*, 136 Ill. 2d 169, 186, 554 N.E.2d 1381, 1389 (1990), *cert. denied*, 498 U.S. 900, 112 L. Ed. 2d 214, 111 S. Ct. 256 (1990). The trial court's determination on this matter will not be overturned absent a showing of an abuse of discretion. *City of Chicago*, 136 Ill. 2d at 186, 554 N.E.2d at 1389. Proponents of the evidence must convince the trial court that the evidence is both " 'of the type customarily relied upon by experts in the field, and *that such items are sufficiently trustworthy to make such reliance reasonable.*' " (Emphasis in original.) *Lovelace v. Four Lakes Development Co.*, 170 Ill. App. 3d 378, 384, 523 N.E.2d 1335, 1339 (1988), *appeal denied*, 122 Ill. 2d 577, 530 N.E.2d 248 (1988), citing Graham, *Expert Witness Testimony and the Federal Rules of Evidence: Insuring Adequate Assurance of Trustworthiness*, 1986 U. Ill. L. Rev. 43, 75.

One letter from attorney Judy Cates informed plaintiff that Dr. Dedo found no malpractice. Letters from defendants informed plaintiff of various events in his case. Letters from attorney Thomas Londrigan informed plaintiff that defendants committed no malpractice. From our review of the letters' contents, we do not find that the letters are the type reasonably relied upon by an expert in the field of legal malpractice. Furthermore, portions of defendants' letters to plaintiff contain irrelevant information beyond the scope of plaintiff's complaint.

The trial court ruled that the letters were inadmissible double hearsay. While the hearsay rule is applicable, hearsay may still be

admissible pursuant to *Wilson v. Clark*. A trial court's reasons for determining the admissibility of evidence are immaterial on appeal if there is a proper basis appearing in the record or law which would sustain the trial court's ruling. *Werner v. Botti, Marinaccio & De-Salvo*, 205 Ill. App. 3d 673, 679, 563 N.E.2d 1147, 1152 (1990). For the reasons set forth in this opinion, we find that the letters were appropriately ruled inadmissible.

Defendants finally claim that the verdict should be reduced due to several errors in the order of judgment.

First, defendants claim that the judgment exceeded the stipulated amount of damages plaintiff could recover. The defendants cite *Sheppard v. Krol*, 218 Ill. App. 3d 254, 578 N.E.2d 212 (1991), for the proposition that the plaintiff must plead and prove the existence of a solvent defendant. To resolve this issue, we must review that proposition.

*Sheppard v. Krol* was a legal malpractice case based upon an underlying product liability case. One of the defendant's positions was:

> "[P]laintiff has alleged no facts to establish that a judgment against a manufacturer would have been collectible. When a claim is alleged to have been lost by the attorney's negligence, the plaintiff must plead and prove the existence of a solvent defendant in the underlying claim." *Sheppard*, 218 Ill. App. 3d at 259, 578 N.E.2d at 216, citing *Goldzier v. Poole*, 82 Ill. App. 469, 471 (1898).

In resolving the issue, the court found that the plaintiff admitted his inability to prove recovery but for the negligence of his attorney. *Sheppard*, 218 Ill. App. 3d at 258, 578 N.E.2d at 217. The reason the plaintiff was unable to make such proof was because he did not know the identity of the manufacturer. *Sheppard*, 218 Ill. App. 3d at 258, 578 N.E.2d at 217. The solvency of the manufacturer was never an issue in the case since the manufacturer was never identified.

The premise that a plaintiff in a legal malpractice case must plead and prove the existence of a solvent defendant in the underlying claim originates in *Goldzier v. Poole*. The underlying case in *Goldzier* was a personal injury action. *Goldzier*, 82 Ill. App. 469. Plaintiff's attorney negligently allowed the underlying personal injury action to be dismissed for want of prosecution. *Goldzier*, 82 Ill. App. 469. Before a subsequent case could be brought, the personal injury defendant became insolvent. *Goldzier*, 82 Ill. App. at 470. In this case of first impression, the court held:

> "[I]t [is] the burden of the plaintiff to establish his measure of damages, and to show what the actual injury is, by showing the

validity of the demand which he has lost, and the fact that it could in part or in whole have been realized had the attorney not been negligent." *Goldzier*, 82 Ill. App. at 472.

Plaintiff's personal injury action was dismissed on April 20, 1893. *Goldzier*, 82 Ill. App. 469. The defendant became insolvent on July 1, 1893. *Goldzier*, 82 Ill. App. at 470. The court reversed and remanded the case for the purpose of determining the defendant's solvency on April 20, 1893. *Goldzier*, 82 Ill. App. at 473.

■ The *Goldzier* holding does not mention collectability. Collectability should not, and must not, be equated with solvency. Collectability connotes that the entire judgment would be satisfied by the underlying tortfeasor. Such a meaning was neither contemplated nor intended by the *Goldzier* decision. In *Goldzier*, the court did not require proof of solvency in a specific dollar amount and defined solvency as "the fact that [the damages] could *in part or in whole* have been realized had the attorney not been negligent." (Emphasis added.) *Goldzier*, 82 Ill. App. at 472. Requiring evidence of total collectability injects elements of proof in the legal malpractice trial which are neither relevant nor necessary and which would unnecessarily complicate and lengthen the trial.

The gravamen of a legal malpractice action is that the plaintiff had a valid cause of action for injuries caused by a third-party tortfeasor. The plaintiff would have been recompensed for the injury but for the negligence of the plaintiff's attorney. Consequently, the attorney who is deemed negligent stands in place of the third-party tortfeasor to recompense the plaintiff. The legal malpractice action places the plaintiff in the same position he or she would have occupied but for the attorney's negligence. The operative words are "in the same position." The link exists to ensure that the plaintiff is in no better position by bringing suit against the attorney than if the underlying action against the third-party tortfeasor had been successfully prosecuted.

■ The proof necessary to satisfy the solvency requirement is distinctly different from the proof required to establish a *prima facie* case. The exact nature of the proof will be dictated by the nature of the underlying case. In this case, the proof necessary to satisfy the solvency requirement was met in two respects. First, Dr. Finch was an Illinois licensed physician in practice and on the staff of at least one hospital. Dr. Finch charged plaintiff for services performed. These facts establish that Dr. Finch had the ability to generate and earn income, satisfying the *Goldzier* solvency requirement. The parties also stipulated that Dr. Finch had a $2 million applicable malpractice insurance policy.

The defendants argue that the stipulation worked to cap the amount of plaintiff's judgment. The record supports defendants' argument. One of the defense attorneys stated that "any verdict against Dr. Finch *** should be reduced so as not to exceed the amount of Dr. Finch's medical malpractice insurance coverage." During this discussion of what could be included in opening statements, the plaintiff's attorneys made no agreements. The stipulation was later revisited when the issue was whether the stipulation should be presented to the jury. One of the defense attorneys agreed that the stipulation need not go to the jury so long as the court was going to reduce the verdict. The court stated that the stipulation would be considered when the judgment was entered and that "it will constitute the limit that can be recovered." Plaintiff's attorneys did not disagree with the court.

Subsequent to this discussion, evidence was introduced that Dr. Finch performed the operation on the plaintiff with Dr. Falconer's assistance. Dr. Falconer was then an intern with St. John's Hospital in Springfield, Illinois. Dr. Finch could not testify whether he or Dr. Falconer performed the insertion during the procedure at St. John's Hospital. At that point, the liability expanded to include Dr. Falconer and St. John's Hospital. The solvency of Dr. Falconer and St. John's Hospital is immaterial since the *Goldzier* solvency requirement was met through Dr. Finch.

■ The issue is then whether the trial court was bound by the parties' stipulation. Stipulations are not necessarily conclusive. *Brink v. Industrial Comm'n*, 368 Ill. 607, 609, 15 N.E.2d 491, 492 (1938). In the exercise of sound judicial discretion and to further the ends of justice, a trial court can relieve the parties from stipulations. *Brink*, 368 Ill. at 609, 15 N.E.2d at 492. On appeal, the trial court's discretion will not be disturbed unless a party proves manifest abuse. *Brink*, 368 Ill. at 609, 15 N.E.2d at 492. The defendant has offered nothing which rises to the level of manifest abuse. In fact, nothing has been offered suggesting that anything different would have been done either in the presentation of evidence or in the procedure of the trial if the stipulation had not been entered. The only difference may have been the presentation of evidence concerning the insurance or solvency of Dr. Finch, Dr. Falconer, and St. John's Hospital. This is precisely the evidence the defense attorneys were trying to keep from being presented to the jury. The fact that the number of parties who were potentially liable for the plaintiff's injuries expanded during the trial should not deprive the plaintiff of full compensation based upon a stipulation concerning a collateral issue.

■ Defendants also claim that the trial court misapplied the

healing-art-malpractice provisions of the Code of Civil Procedure (Code) (735 ILCS 5/2—1701 through 2—1719 (West 1992)) by not allowing periodic payments over the remainder of plaintiff's life. In healing-art-malpractice cases, section 2—1706(c) of the Code provides:

"If the trier of fact finds that certain future damages will accrue for the remainder of the plaintiff's life, the trier of fact shall make a specific finding specifying the remaining life expectancy of the plaintiff and the amount of periodic payments for those damages must be calculated based on the remaining life expectancy of the plaintiff. Payment for such damages shall be made periodically and shall continue until the plaintiff's remaining life expectancy is reached or the plaintiff dies, whichever is later." 735 ILCS 5/2—1706(c) (West 1992).

Defendants contend that because the underlying case involved a medical malpractice claim, the above periodic-payments section applies to this legal malpractice verdict. Defendants cite no authority for the proposition that the healing-art-malpractice provisions of the Code apply to legal malpractice verdicts. The case cited by defendants, *Nika v. Danz*, 199 Ill. App. 3d 296, 556 N.E.2d 873 (1990), does not stand for this proposition. In *Nika*, the trial court instructed the jury on the negligence issues in the underlying personal injury case. *Nika*, 199 Ill. App. 3d at 307, 556 N.E.2d at 881. The instruction involves damages since the plaintiff must establish the merit of the underlying case. *Nika*, 199 Ill. App. 3d at 308, 556 N.E.2d at 882. In this case, plaintiff was responsible to prove that he would have prevailed against his health care providers but for defendants' legal malpractice. *Nika* does not involve the healing-art-malpractice provisions of the Code and does not address post-verdict credits, periodic payments, and setoffs.

Clearly, this case does not traditionally fall under the healing-art-malpractice provisions of the Code because plaintiff is not suing a licensed health care provider. See *Lyon v. Hasbro Industries, Inc.*, 156 Ill. App. 3d 649, 654, 509 N.E.2d 702, 706 (1987). The verdict in this case was not against a health care provider but was against the lawyers who committed malpractice by mishandling plaintiff's case against his health care providers. Plaintiff's verdict is based upon the value of his claim against the health care providers. Absent express judicial authority that a legal malpractice verdict should be treated as a medical malpractice verdict, we must determine and defer to legislative intent in the interpretation and construction of this statute. *Benjamin v. Cablevision Programming Investments*, 114 Ill. 2d 150, 157, 499 N.E.2d 1309, 1313 (1986). To determine legislative intent, we must consider the nature, object, and purpose of the entire

statute. *Benjamin*, 114 Ill. 2d at 157, 499 N.E.2d at 1313. If legislative intent can be determined from the statute's language, then that intent will prevail without resorting to outside sources. *Benjamin*, 114 Ill. 2d at 157, 499 N.E.2d at 1313. The statute's language should be given its plain and ordinary meaning. *Coldwell Banker Residential Real Estate Services of Illinois, Inc. v. Clayton*, 105 Ill. 2d 389, 396, 475 N.E.2d 536, 539 (1985). Statutes in derogation of common law will not be extended beyond what the language of the statute absolutely requires by its express terms or by clear implication or intendment. *In re W.W.*, 97 Ill. 2d 53, 57, 454 N.E.2d 207, 209 (1983).

We note that the healing-art-malpractice provisions of the Code were enacted in response to a perceived crisis in medical malpractice litigation. *Bernier v. Burris*, 113 Ill. 2d 219, 229, 497 N.E.2d 763, 768 (1986). Section 2—1706 of the Code (735 ILCS 5/2—1706 (West 1992)) does not address applicability to cases other than those for healing art malpractice. If our legislature intended the statute to require periodic payments in a legal malpractice setting, it would have been simple to so indicate. We note that section 2—1115 of the Code (735 ILCS 5/2—1115 (West 1992)), dealing with punitive damages, specifically states its application to both legal and medical malpractice cases. Accordingly, we find no error in the trial court's refusal to apply to this legal malpractice verdict the healing-art-malpractice provision requiring periodic payments.

■ Defendants also claim that the trial court erred because it failed to reduce the verdict by the amount of money plaintiff received from insurance, pursuant to section 2—1205 of the Code (735 ILCS 5/2—1205 (West 1992)). This statute modifies the collateral source rule and allows the reduction of a medical malpractice judgment by 100% of the medical, hospital, nursing, or caretaking charges associated with the claim. Because the defendants failed to provide the trial court with the amount of benefits that were paid or had become payable to plaintiff by collateral sources, not subject to recoupment through subrogation or lien, we could deem the issue waived. *DeCastris v. Gutta*, 237 Ill. App. 3d 168, 175, 604 N.E.2d 359, 364 (1992). However, to be consistent with the balance of this opinion, we find that section 2—1205 of the Code does not apply to legal malpractice cases. Section 2—1205 expressly applies to an action "to recover for [an] injury based on an allegation of negligence or other wrongful act, not including intentional torts, on the part of a licensed hospital or physician." 735 ILCS 5/2—1205 (West 1992). As previously stated, statutory language should be given its plain and ordinary meaning. *Coldwell Banker Residential Real Estate Services of Illinois, Inc.*, 105 Ill. 2d at 396, 475 N.E.2d at 539. The legislature could have simply

stated that this section was also applicable to legal malpractice cases. Thus, the trial court did not err in rejecting the defendants' request for a reduction of the verdict pursuant to section 2—1205.

■ Finally, defendants claim that the trial court erred because it failed to reduce the award by the amount of defendants' attorney fees which plaintiff would have been obligated to pay to defendants had they successfully prosecuted plaintiff's medical malpractice action. This issue has not yet been decided in Illinois. A minority of states allow the reduction. In *Foster v. Duggin*, 695 S.W.2d 526, 527 (Tenn. 1985), the court applied the majority approach and stated:

> "[T]he majority view *** holds that no credit is due the attorney since he has breached the contract by performing negligently, and since deduction of his fee would not fully compensate the client who has incurred additional legal fees in pursuing the malpractice action. These additional fees are said to cancel out any fees which the plaintiff would have owed the attorney had he performed competently."

A legal malpractice plaintiff is only entitled to recover those sums which he would have recovered if his underlying suit was successfully prosecuted. *Albright v. Seyfarth, Fairweather, Shaw & Geraldson*, 176 Ill. App. 3d 921, 926, 531 N.E.2d 948, 951 (1988), *appeal denied*, 125 Ill. 2d 563, 537 N.E.2d 807 (1989). We elect to follow the majority rule. To apply the rule suggested by defendants serves to penalize the legal malpractice plaintiff. Under defendants' proposed calculation, a legal malpractice plaintiff's verdict is reduced by his malpractice attorney fees and by the amount of fees plaintiff would have incurred had the original attorneys performed competently. The majority approach is much more equitable and operates under the assumption that the attorney fees of the first and second sets of attorneys are essentially equal. By only reducing the legal malpractice verdict by the attorney fees owed to the second set of attorneys, the injured plaintiff is in the same position he would have been in but for the negligence of the first set of attorneys. Therefore, the trial court did not err in refusing to apply the setoff requested by defendants.

■ In light of our decision regarding the inapplicability of the healing-art-malpractice provisions to the verdict, we must consider the judgment entered by the trial court. Pursuant to Supreme Court Rule 366(a)(5) (134 Ill. 2d R. 366(a)(5)), "a reviewing court may, in the exercise of its responsibility for a just result, ignore consideration of waiver and decide a case on grounds not properly raised or *not raised at all by the parties*." (Emphasis added.) *Occidental Chemical Co. v. Agri Profit Systems, Inc.*, 37 Ill. App. 3d 599, 603, 346 N.E.2d 482, 485

(1975). In the September 16, 1992, judgment order and the October 28, 1992, modification of the judgment order, the trial court reduced the future-damage award pursuant to sections 2—1708(2) and 2—1712 of the Code (Ill. Rev. Stat. 1991, ch. 110, pars. 2—1708(2), 2—1712 (now 735 ILCS 5/2—1708(2), 2—1712 (West 1992))). Both of these sections are contained within the healing-art-malpractice sections of the Code and should not have been applied in entering judgment on the jury's verdict. Therefore, we reverse the judgment of the circuit court of Madison County and remand this case to the trial court for entry of judgment on the jury's verdict consistent with this opinion.

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed in part and reversed in part, and this cause is remanded for the entry of a judgment consistent with this opinion.

Affirmed in part; reversed in part and remanded with directions.

JUSTICE KUEHN,[1] specially concurring:
I concur in all aspects of the majority opinion. I write separately to respond to issues raised in the dissent regarding the stipulation.

By underscoring the effect of a stipulation, the dissent has de-emphasized the trial court's discretion to set aside a stipulation to further the ends of justice. *Brink v. Industrial Comm'n*, 368 Ill. 607, 609, 15 N.E.2d 491, 492 (1938). I agree that a stipulation may effectively withdraw an issue from further consideration. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 462, 605 N.E.2d 493, 506 (1992). However, a stipulation's conclusive effect does not obstruct the trial court's discretion to set aside that stipulation should justice so require. Furthermore, whether a stipulation is described as a stipulation or a judicial admission does not alter the trial court's discretion to set it aside.

The dissent further ignores the fact that the defendants were the ones who kept advancing the stipulation to intentionally cap liability. The defendants were aware that Dr. Falconer had an additional $5 million in applicable insurance coverage. It is true that no evidence of Dr. Finch's salary, assets, liabilities, likelihood of continued employment, health, or age was introduced at trial. But no specific financial information was heard during the trial because defense counsel did not want it heard. The benefit defendants derived from this stipulation is obvious. The stipulation effectively kept the jury from learning about the defendants' finances. The benefit plaintiff derived from this stipulation is not so apparent.

[1]Justice Kuehn was substituted for one of the original panel members, Justice Lewis, who retired effective August 1, 1995.

The dissent would burden a plaintiff with the task of proving solvency of a defendant in an amount not yet determined by the jury. Proving every intimate financial detail of an underlying physician's life in order to achieve the optimum cap that the dissent's reading of *Goldzier v. Poole* would impose is illogical. The language of *Goldzier* was never intended to require such a level of proof. If it was, we should overrule it. Furthermore, I seriously doubt that defense counsel would want a jury to hear complete details of their clients' financial portfolios.

In reviewing the trial court's decision to relieve the parties of the stipulation, we must bear in mind that the verdict does not reflect knowledge of the $2 million stipulation. The jury was never advised that the parties entered into a stipulation. We must also remember that the court exercised its discretion to set aside the stipulation before the trial court entered judgment on the jury's verdict.

During trial, liability expanded to include Dr. Falconer and St. John's Hospital, thereby expanding applicable insurance coverage to $7 millon. The dissent would cap plaintiff's recovery to $2 million. Plaintiff should not be limited to half a cup of justice. He is entitled to the full measure of justice awarded him because of his medical malpractice attorneys' negligence. I fail to see how the trial court abused its discretion when its exercise of discretion was based on truth and served to produce a just result. Given the circumstances, I opt for truth and justice over the sanctity of stipulations.

JUSTICE McLAUGHLIN, specially concurring in part and dissenting in part:

I respectfully dissent from that portion of the majority's opinion which holds that the plaintiff is not bound by the stipulation entered into at trial which established the maximum recoverable amount of $2 million. I further dissent from that portion of the majority's opinion which holds that proof of the "solvency" of Dr. Finch was established by evidence that (1) Dr. Finch was a licensed physician on the staff of one hospital, and (2) he charged for his services.

A review of the record reveals the following statement:

> "MR. McMULLIN [defendants' counsel]: That it had been stipulated by the parties that Dr. Finch has 2 million dollars in malpractice coverage. This is no longer an issue in the case that needs to be proved and therefore there should be no mention to the jury as to the amount of malpractice insurance available to pay any verdict against Dr. Finch, but instead any verdict for the plaintiff—the plaintiff obtains should be reduced so as not to exceed the amount of Dr. Finch's medical malpractice insurance coverage."

Later in trial, the following colloquy occurred:

"MR. CHAPMAN [plaintiff's counsel]: Well, Judge, I think what the question was is whether to read it to the jury, and I don't care whether it's read or not. *I think we've already agreed to stipulate that it was two million dollars involved.* The question was whether we wanted to put it before the jury. And I don't care whether it goes or not. *I think this just off the record shows that is the solvency of this defendant.*

MR. BRONSKY [defendants' counsel]: We agree that it doesn't have to go to the jury as long as the Court is going to reduce the verdict—

THE COURT: To the extent that it might exceed that two million, that two million represents the limit of what—

MR. BRONSKY: Liability.

THE COURT: *But for purposes of any judgment that's entered, it will be taken into consideration and it will constitute the limit that can be recovered.*

MR. CHAPMAN: *That's correct.*" (Emphasis added.)

The trial court refused to enforce the stipulation.

There are two distinct and separate reasons for my dissent.

## A

In the particular setting of this case, the stipulation rose to the level of a judicial admission. When plaintiff's counsel agreed with the statement by the trial judge that $2 million would constitute the "limit that can be recovered," the issue of maximum recovery was removed from consideration. "A stipulation, or a judicial admission, is an agreement between the parties or their attorneys with respect to business before the court." *Lee v. Chicago Transit Authority,* 152 Ill. 2d 432, 462, 605 N.E.2d 493, 505-06 (1992); *American Pharmaseal v. TEC Systems,* 162 Ill. App. 3d 351, 355, 515 N.E.2d 432, 434 (1987). The agreement that $2 million was the "limit that can be recovered" had the effect of withdrawing that issue from further consideration. *Lee,* 152 Ill. 2d at 462, 605 N.E.2d at 506; 34 Ill. L. & Prac. *Stipulations* § 8 (1958); 2 J. Strong, McCormick on Evidence § 254, at 142 (4th ed. 1992).

A judicial admission is conclusive upon the party making it. It may not be controverted at trial, or on appeal, and has the effect of withdrawing that issue or fact from contention. *Brummet v. Farel,* 217 Ill. App. 3d 264, 267, 576 N.E.2d 1232, 1234 (1991).

Inasmuch as the stipulation/judicial admission of the plaintiff that $2 million would "constitute the limit that can be recovered" in this action, I believe that it was an abuse of discretion for the trial court not to give that stipulation effect. If stipulations are not

enforced by the courts, it is my opinion that the litigation process will suffer. In short, if counsel cannot rely on the sanctity of a stipulation given in open court, there will be no stipulations.

The stipulation here was clear. It was straightforward. Had the verdict not exceeded the stipulated cap, there would have been no question about its good faith or its efficacy. It is not for this court to question the advisability of stipulations. It is clear it was made for the express purposes of establishing solvency (which was clearly in counsel's minds as being required at trial) and limiting recoverable damages. This court should give it that construction; especially where it was never alleged or proven that the stipulation was unreasonable, fraudulent, obtained under duress, or in violation of public policy. *Dawdy v. Sample*, 178 Ill. App. 3d 118, 127, 532 N.E.2d 1128, 1135 (1989).

## B

I agree with the majority that "collectability" is not synonymous with "solvency." And, I agree that "solvency" is the better standard to apply to legal malpractice cases.

The law in Illinois is, at best, unclear as to the precise pleading and proof requirements necessary to meet the plaintiff's burden to establish "solvency" of the defendant in the underlying case.[2] Yet, it is clear that there must be *some* evidence that the plaintiff could have recovered on the original case in order for the plaintiff to prove the pecuniary loss necessary to recover.

The damages resulting from legal malpractice are pecuniary injuries to intangible property interests; they are not personal injuries. *Yates v. Muir*, 130 Ill. App. 3d 604, 609, 474 N.E.2d 934, 937 (1985), *rev'd on other grounds*, 112 Ill. 2d 205, 492 N.E.2d 1267 (1986). Damages flowing from legal malpractice are never presumed, but the plaintiff must prove that he suffered the injury for which recovery is sought, *e.g.*, the plaintiff must prove that he suffered a "pecuniary" injury to his property interest, as opposed to a personal one, resulting from the negligence of an attorney. *Gruse v. Belline*, 138 Ill. App. 3d 689, 697, 486 N.E.2d 398, 404 (1985). The majority cites to *Goldzier v. Poole*, 82 Ill. App. 469 (1898), to support their conclusion that in order to recover, the plaintiff need only show solvency "in part or in whole."

*Goldzier* clearly holds that solvency cannot be presumed, and

---

[2]*Cf. Donahue v. Weitzman*, No. 5—93—0285, order at 11-12 (unpublished order under Supreme Court Rule 23 (134 Ill. 2d R. 23)), *appeal denied*, 164 Ill. 2d 561, 660 N.E.2d 1267 (1995).

proof of same is the plaintiff's burden. The phase "in part or in whole" must necessarily refer to the fact that even where there is proof of a "part" one may only recover for that part. To hold otherwise ignores the balance of the language in *Goldzier* and equates the damages sought herein to personal injuries, when, in fact, they are property damages.

In the instant case, the majority holds that the fact that Dr. Finch was a physician who billed for his services was sufficient evidence of the solvency of Dr. Finch to allow for plaintiff to recover the entire judgment. I do not agree. The parties stipulated to the solvency of Dr. Finch at trial. That stipulation should be given effect. Merely because a physician is working and billing for his services is insufficient evidence of solvency to meet plaintiff's burden. There was no evidence of Dr. Finch's salary, his expenses, his other obligations, the title of any of his property, whether any of his property is nonattachable (pension plans), his debts, his likelihood of continued employment, his health, his age, or the type of Dr. Finch's practice—all of which are relevant in order to determine his ability to pay the portion of the judgment which remains uninsured.

I would reverse that portion of the judgment which exceeds $2 million and would affirm a judgment for the plaintiff for $2 million. I agree with the majority that the healing-art-malpractice provisions do not apply.